1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EUREKA DIVISION

8  DANIEL KISLIUK,                                    Case No.  24-cv-03440-RMI

9                          Plaintiff,

10              v.                                    **ORDER ON MOTIONS TO DISMISS**

11  CITY OF FORT BRAGG, et al.,                       Re: Dkt. Nos. 30, 33, 34, 38, 54, 55

12                          Defendants.

13

14          Now pending before the court is the motion (Dkt. 33) of Defendants Bernie Norvell, City

15  of Fort Bragg, Thomas O'Neal, Tyler Baker, Padraic Ferris, Jonathan McLaughlin, and Neil

16  Cervenka (collectively, "City Defendants") to dismiss Plaintiff Daniel Kisliuk's second amended

17  complaint (Dkt. 30).  Defendants Mendocino County and Mendocino County Sheriff's Office

18  (collectively, "County Defendants") have also so moved (Dkts. 34, 38), as have County employees

19  Eloise Kelsey, Eldon Johnston, and Stephen Bohner[1] (Dkt. 54) and Mendocino County Superior

20  Court Judge Clayton Brennan (Dkt. 55).  Pursuant to Federal Rule of Civil Procedure 78(b) and

21  Civil Local Rule 7-1(b), the court finds the matter suitable for disposition without oral argument.

22  For the reasons stated below, Judge Brennan's motion will be GRANTED, and the remaining

23  motions will be GRANTED IN PART AND DENIED IN PART.

24      **I.      Factual Background[2]**

25

26  [1] Plaintiff spells Johnston's first name "Eldin" and Bohner's last name "Bonner."  This opinion uses the spellings
provided by Johnston and Bohner in their motion.  (Dkt. 54, p. 2).

27
28  [2] "In assessing whether a plaintiff has stated a claim, we accept as true all well-pleaded factual allegations, and
construe all factual inferences in the light most favorable to the plaintiff."  *Ashcroft v. Iqbal*, 556 U.S. 662, 679
(2009).

United States District Court
Northern District of California

a. *November 1 Arrest*

In October of 2023, juveniles in the Fort Bragg area had been torturing and killing local cats.  (Dkt. 30, p. 4).  Around this time, Plaintiff's pet tabby became lost.  *Id.* at 4.  Concerned for the cat's well-being, Plaintiff reported the lost pet to Fort Bragg Police Officer Jarod Frank, providing a description of the tabby and the place where Plaintiff had last seen it.  *Id.* at 14.  Plaintiff was homeless at the time, and he alleges that his cat was the only "family member" in his life at the time.  *Id.* at 10.

Around noon on November 1, 2023, Plaintiff was in his car listening to police radio traffic when Captain Thomas O'Neal of the Fort Bragg Police Department broadcast a report of an injured tabby.  (Dkt. 30, p. 5).  The tabby matched the description of Plaintiff's cat and had been spotted within a few blocks of where Plaintiff's cat was last seen.  *Id.* at 5.  Hoping that his cat had been found, and distressed at the prospect that his cat might have been injured by the sadistic juveniles, Plaintiff left his car and ran to the cat's reported location.  *Id.* at 5.  When he arrived at the scene, however, neither the cat nor Officer Tyler Baker (who had claimed he was at the location) were present.  *Id.* at 5.  Officer Baker then claimed over the radio to have followed the cat to a nearby public park.  *Id.*  Plaintiff ran to the park, but did not see Officer Baker there, either.  *Id.*

After searching for his cat without success, Plaintiff returned to where his car was parked.  (Dkt. 30, p. 5).  Where his car should have been, however, were Captain O'Neal and his "entire subordinate police force that was on duty, standing on the place my car had been parked."  *Id.*  While Plaintiff had been out searching for his cat, O'Neal and Sergeant Padraic Ferris had towed Plaintiff's car for an expired registration.  *Id.* at 5.  The car contained all of Plaintiff's belongings.  *Id.*  While officers in Fort Bragg normally warn vehicle owners of an impending tow, they did not provide Plaintiff any such warning, even though they allegedly knew Plaintiff's location leading up to the tow.  *Id.*  Plaintiff claims that had he been warned of the impending tow, he could have arranged to move the vehicle onto private property, or at least retrieved some of his belongings before the car was towed away.  *Id.* at 17.

While confronting Captain O'Neal about the towing, Plaintiff realized that O'Neal had

2

fabricated the sighting of Plaintiff's cat in order to lure Plaintiff away from his car.  (Dkt. 30, pp. 5–6).  Extremely frustrated and distressed, Plaintiff began to leave.  *Id.* at 6.  As he left, he unthinkingly expressed his frustration and distress by saying "I'm about to kill you guys[,] dude." *Id.*  Despite having no evidence that Plaintiff intended to obstruct any investigation or operation, the police then arrested plaintiff for violating California Penal Code Section 69, which criminalizes the use of threats of violence to delay or prevent a law enforcement officer from performing a lawful duty.  *Id.*  Plaintiff alleges that Sergeant Ferris wore a "mischievous grin" as Plaintiff was arrested.  *Id.* at 7.

Plaintiff agrees that he resisted arrest during this encounter and was properly charged with and convicted of such.  (Dkt. 30, p. 9).  However, Plaintiff claims that the arrest itself was unlawful retaliation for his exercise of First Amendment rights.  *Id.* at 9.

During Plaintiff's arrest, Plaintiff's miswak toothbrush was taken from his mouth and thrown on the ground.  (Dkt. 30, p. 7).  This is allegedly not the first miswak of Plaintiff's which has been unnecessarily destroyed by Fort Bragg police, and Captain O'Neal has previously defended the destructions on the grounds that the Fort Bragg police "don't take biological property[.]"  *Id.* at 8.

After Plaintiff calmed down, Captain O'Neal removed Plaintiff's keychain from Plaintiff's hip and directed Sergeant Ferris to give it to the tow company.  (Dkt. 30, p. 8).  Besides the keys to the towed vehicle, the keychain contained unrelated keys and thumb drives belonging to Plaintiff.  *Id.*  Plaintiff asserts that the keys were not taken pursuant to a search.  *Id.*

Once Plaintiff was transferred to the back of a patrol vehicle, Captain O'Neal allegedly admitted that he fabricated the call about the cat to lure Plaintiff away from Plaintiff's vehicle. (Dkt. 30, p. 9).  Around the same time, O'Neal told Plaintiff that listening to the police radio was getting Plaintiff into trouble.  *Id.* at 10.  O'Neal had allegedly fabricated the story knowing that cats were being tortured and killed in the area and that Plaintiff's cat was the only "family" he had at the moment.  *Id.*  Indeed, O'Neal admitted in a subsequent police report that he used this particular ruse "due to [Plaintiff's] recent multiple social media posts regarding the animal abuse investigation involving a cat."  *Id.* at 13.  Further, Plaintiff had described his cat to Officer Frank

after it was lost, so the police knew that it was a tabby and where it had last been seen.  *Id.* at 14.

As justification for the subterfuge, Captain O'Neal stated that Plaintiff was dangerous and that the deception was necessary to ensure officer safety.  (Dkt. 30, p. 9).  In a later police report describing the November 1 arrest, O'Neal claimed that Plaintiff was "involved" in five assault cases in the preceding six months.  *Id.* at 11.  However, Plaintiff claims that he was the victim in at least four of these cases, and that the district attorney later confirmed that Plaintiff acted in self-defense in one of the cases.  *Id.*  O'Neal also claimed in the same report that Plaintiff had attacked a female police officer unprovoked.  *Id.* at 11–12.  Plaintiff admits that he headbutted the officer, but says that the incident took place five years earlier and that the officer had verbally and physically provoked him.  *Id.* at 12, 13.  O'Neal claimed in his report that Plaintiff had not taken advantage of services offered to him.  *Id.* at 12.  However, Plaintiff says he was never contacted to receive any such services.  *Id.*  O'Neal further claimed that Plaintiff had once expressed willingness to "jam [a] knife into someone's throat if they don't stop messing with me[;]" Plaintiff says he never said anything remotely like this.  O'Neal claimed that Plaintiff obstructed the path of officers working on an investigation; Plaintiff took a video of the incident which showed that the officers were never obstructed.  *Id.* Plaintiff argues that if O'Neal had really believed Plaintiff to be unpredictable and violent, O'Neal would not have told a story calculated to distress Plaintiff.  *Id.* at 13.  Plaintiff also alleges that other suspects, even aggressive ones, were not subjected to these distressing tactics.  *Id.* at 16.

Plaintiff alleges that Captain O'Neal's report contained several other falsifications as well.  Namely, Plaintiff says that O'Neal falsely alleged that Plaintiff charged at officers at the scene of the towing, omitted the fact that Plaintiff was walking away at the time he uttered his statement about killing the officers, and reworded the statement from "I'm about to kill you guys, dude" to the more threatening "I'm going to kill you all."  (Dkt. 30, p. 14).

Plaintiff was taken to Mendocino County Jail.  (Dkt. 30, p. 15).  His distress at the day's events was so extreme that he says he asked Officer Frank "to just put one in my head rather than send me to jail."  *Id.*  However, Captain O'Neal memorialized this statement in his report as "something to the effect of" "When I get out, I am going to find you & provoke you so much that

United States District Court
Northern District of California

1    you are going to have to put a bullet in my head[.]"  Medical notes taken during Plaintiff's

2    booking support Plaintiff's version of the statement.  *Id.*

3    At the time of his arrest, Plaintiff was wearing a heavy silver bracelet, a fact documented

4    by the arresting officers.  (Dkt. 30, p. 18).  When Plaintiff was booked into the Mendocino County

5    Jail, however, he alleges that the silver bracelet was not among his effects.  *Id.*  One deputy

6    noticed this discrepancy and asked where the silver bracelet was, and another deputy replied that it

7    was in a certain jewelry pouch.  However, the jewelry pouch in question was too small to contain

8    Plaintiff's bracelet, so Plaintiff knew it could not be in the pouch.  The bracelet was not logged as

9    part of Plaintiff's property when Plaintiff was booked in Mendocino County Jail, and it was not

10   returned to Plaintiff when he left the jail.  From this, Plaintiff infers that the bracelet was stolen,

11   likely by the second deputy.  *Id.*

12   After being booked, Plaintiff spoke to Lieutenant[3] Eldon Johnston and requested halal

13   meals.  (Dkt. 30, p. 19).  Johnston refused to accommodate Plaintiff's request for halal meals until

14   Plaintiff was processed into housing and filled out a request form.  *Id.*  This was despite the fact

15   that Plaintiff had filled out the same form at the same jail several years earlier, meaning a quick

16   check of the records would have confirmed that Plaintiff subscribed to a halal diet.  Plaintiff states

17   that "the jail has a tendency to ignore requests for diets such as mine."  *Id.*  Plaintiff "tried not to

18   eat for the first few meals" to avoid violating his religious beliefs, but eventually "caved" and ate

19   non-halal food to keep from starving.  *Id.*

20   While Plaintiff was in custody, County Prosecutor Eloise Kelsey filed charges against

21   Plaintiff, allegedly despite knowing that Plaintiff's conduct was protected by the First

22   Amendment.  (Dkt. 30, p. 20).  Plaintiff ultimately posted bail and moved into a hotel.  *Id.*  While

23   staying there, he suffered from nightmares and "continuous emotional distress" due to the events

24   of November 1.  *Id.*

25   *b.  November 7 Arrest*

26

27   ───────────────

28   [3] Plaintiff alternately refers to Johnston as "Lt." and "Sergeant".  (Dkt. 30, pp. 19, 25).  Because Bohner, who reported to Johnston during the events at issue, was a sergeant at the time, the court will refer to Johnston as "Lieutenant" for clarity.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    On November 7, 2023, while in his hotel room and listening to the police radio frequency,

2    Plaintiff heard a call about a woman's car being towed.  (Dkt. 30, p. 20).  Still "extremely

3    frustrated" about the events of November 1, Plaintiff traveled to the scene to record the officers'

4    actions.  *Id.*  Plaintiff apparently brought his pocketknife with him.  *Id.* at 21.  When Plaintiff

5    arrived, Captain O'Neal and Sergeant Jonathan McLaughlin were present.  *Id.* at 20.  O'Neal

6    directed Plaintiff not to come any closer than a specific point, and Plaintiff complied.  *Id.*  The

7    video taken by Plaintiff of the incident (and linked in the complaint) shows Plaintiff speaking

8    with, and at times shouting at, the officers as he records.  Sharia Financial, *Mother & Child*

9    *Detained & Separated by Fort Bragg Police Department*, YOUTUBE (Nov. 14, 2023),

10    https://www.youtube.com/watch?v=iH90MbTXot8 (hereinafter "Nov. 7 Video").  When Plaintiff

11    protested at not being allowed to get closer, O'Neal stated that Plaintiff had threatened to kill the

12    officers earlier.  Nov. 7 Video at 1:38.  After about two minutes of this, O'Neal stated that he

13    would dispatch a mental health unit to the site if Plaintiff could not calm himself down.  *Id.* at

14    1:57–2:02.  To avoid arrest, Plaintiff returned to his hotel.  (Dkt. 30, p. 21).

15    As Plaintiff approached the hotel, he heard Captain O'Neal announce over the radio that

16    police had detained a mother and child.  (Doc. 30, p. 21).  Believing that he was "missing out on

17    an important incident in the community[,]" Plaintiff returned to the scene to resume recording.  *Id.*

18    As Plaintiff approached the scene, the officers ordered him not to come any closer.  Although

19    Plaintiff was "roughly 150 feet away" from the investigation and told the officers that he no longer

20    had the knife, O'Neal again ordered Plaintiff not to come any closer.  *Id.*  O'Neal said that if

21    Plaintiff wanted to record, he needed to do it from another location which was 300 feet away from

22    the incident.  *Id.* at 22.  O'Neal said that Plaintiff was agitated; the video indicates Plaintiff

23    speaking with a raised voice and breathing heavily.   Nov. 7 Video at 3:40–3:43.  Plaintiff took a

24    few steps back for O'Neal's comfort but did not retreat to the 300-foot location.  *Id.* at 4:07; Dkt.

25    30, p. 22.  O'Neal then stated that if Plaintiff came closer than he already was, he would put

26    Plaintiff in handcuffs.  *Id.*  Plaintiff asserted his First Amendment right to record the proceedings

27    but said that he would not come closer.  *Id.*, Nov. 7 Video at 5:15.

28    Although Plaintiff stayed where he was, Plaintiff and Sergeant McLaughlin argued about

why Plaintiff was not allowed to get closer to the scene. (Dkt. 30, p. 22). Plaintiff also criticized the officers' actions in detaining the woman and her child; their failure to apprehend the cat-torturing juveniles; and Captain O'Neal's conduct, biases, and conflicts of interest. Nov. 7 Video at 5:38–5:43. After a few minutes of this, O'Neal "aggressively approached" Plaintiff and demanded that Plaintiff leave immediately or face arrest. (Dkt. 30, p. 22). Plaintiff immediately began to back away while still recording and arguing with the officers, but only a few seconds after issuing the command to leave the scene, O'Neal declared that Plaintiff was under arrest for failing to obey his order. *Id.*, Nov. 7 Video at 10:08–10:20. Plaintiff complied and was arrested. (Dkt. 30, p. 22).

       *c.  Detention and Release Proceedings*

       After Plaintiff's November 7 arrest, Captain O'Neal and Sergeant McLaughlin requested that Plaintiff's bail from the November 1 arrest be revoked. (Dkt. 30, p. 24). While the bail was never actually revoked, O'Neal told both the Mendocino County Jail and the district attorney that Plaintiff's bail had been revoked. *Id.*

       Upon Plaintiff's booking at Mendocino County Jail, he again informed staff that he was on a halal diet. (Doc. 30, p. 24). Plaintiff's diet was never accommodated. *Id.* at 24, 27.

       Immediately after being placed in a holding cell, Plaintiff called a local bail bond company. (Dkt. 30, p. 24). The bond company's manager told Plaintiff that Plaintiff was not subject to a "hold" and could therefore be bailed out. *Id.* Plaintiff then went through the process of posting bail. *Id.* Roughly an hour later, however, the manager told Plaintiff that the Sheriff's Office would not release Plaintiff because Plaintiff was, in fact, subject to a hold. *Id.* at 24–25. As there was nothing on either the Mendocino County Sheriff's Office website or the relevant court website indicating a hold on Plaintiff, the manager went to the Mendocino County Superior Court to double-check Plaintiff's status. *Id.* at 25. The manager allegedly confirmed with the court that Plaintiff was not subject to a hold and there was no reason that Plaintiff could not be released. *Id.*

       With this information, the bond company manager submitted Plaintiff's bond paperwork to the Sheriff's Office. (Dkt. 30, p. 25). Although a deputy completed the paperwork and the bond

United States District Court
Northern District of California

1    was processed, Sergeant Stephen Bohner allegedly refused to release Plaintiff, citing a "verbal

2    hold order." *Id.*  Plaintiff alleges that Sergeant Bohner and his supervisor, Lieutenant Johnston,

3    should have known that there was no actual hold order in place at the time because they had access

4    to the official records of any holds.  However, Plaintiff "did not get to speak with Johnston about

5    why I was not being released[.]" *Id.*

6         Plaintiff called the bond company manager again.  (Doc. 30, p. 25).  The manager told

7    Plaintiff that the manager did not know what was going on and that this had never happened

8    before.  *Id.*  The manager also consulted an attorney, who allegedly informed him that there was

9    no such thing as a "verbal hold order."  *Id.*

10        Ultimately, Plaintiff waited in custody for 45 hours before he was brought before a judge.

11    (Doc. 30, p. 27).  During this time, Prosecutor Kelsey filed charges against Plaintiff, allegedly

12    despite knowing that the charges were false and Plaintiff's activity was protected.  *Id.* at 26.

13        When Plaintiff was ultimately brought before a court, the judge asked why Plaintiff was

14    still in custody despite having posted bail bonds.  (Dkt. 30, p. 27).  Prosecutor Kelsey stated her

15    belief that the police department's bail revocation request had been signed by another judge, but

16    admitted that she could not verify this.  *Id.*  Kelsey also said that her office had moved to revoke

17    Plaintiff's earlier bail[4] and wanted a hearing on the following Monday.  *Id.* at 27–28.  The judge

18    noted that no documents were on file reflecting a bail revocation and stated that "[t]he Court didn't

19    order" Plaintiff's bail revoked.  *Id.* at 28.  After a recess of several hours for the parties to confer,

20    the judge ordered Plaintiff released "today on bonds already posted, I might add."  *Id.* at 28, 29.

21        Upon release, Plaintiff checked into a motel and immediately felt ill.  (Dkt. 30, p. 29).

22    Plaintiff had caught viral gastroenteritis[5] while in custody, allegedly due to the prolonged

23    detention and refusal to accommodate his halal diet.  *Id.* at 30.

24        A preliminary hearing on Plaintiff's charges was held on December 6, 2023, before Judge

25    Clayton Brennan.  (Dkt. 30, pp. 30, 33).  While both the November 1 and November 7 charges

26

---

27    [4] A copy of this motion shows that it was filed at 4:14 P.M. on the day before the hearing.  (Dkt. 33-1, p. 17).

28    [5] A digestive-system condition often called "stomach flu."  (Dkt. 30-9, p. 3).

were listed on the docket, the events of November 7 were not addressed at the hearing.  *Id.* at 30, 32.  In addition, Captain O'Neal allegedly presented perjured testimony as to the events of November 1, falsely claiming that Plaintiff had "cornered him into the fence" and "raised [Plaintiff's] fist at him" during the encounter.  *Id.* at 32.  At the end of the hearing, Judge Brennan imposed conditions of release forbidding Plaintiff from filming police activities or coming within 1000 feet of officers performing their duties.  *Id.* at 33.

Plaintiff ultimately pled guilty to resisting or obstructing a police officer based on his November 1 conduct.  (Dkt. 33-1, pp. 30, 32).[6]  The charge relating to Plaintiff's November 7 conduct was dismissed.  *Id.* at 30.

## II.    Procedural Background

Plaintiff originally filed this case in this court on June 6, 2024.  *See* Dkt. 1.  Plaintiff's original complaint named four defendants: the City of Fort Bragg ("City"), the Mendocino County Sheriff's Office ("Sheriff's Office"), Captain O'Neal, and Officer Baker.  *Id.* at 2–3.  The case was transferred from the undersigned to Judge Susan Illston on July 26, 2024.  (Dkt. 14).

Plaintiff amended his complaint twice before Judge Illston.  The first amended complaint added Fort Bragg Mayor Bernie Norvell, Sergeant Ferris, Sergeant McLaughlin, and the County as defendants.  (Dkt. 21, pp. 2–3).  It also added several County officials: Prosecutor Kelsey, Lieutenant Johnston, Sergeant Bonner, and Judge Brennan.  *Id.* at 3.  The second amended complaint, filed on September 5, 2024, named the same defendants.  (Dkt. 30, pp. 2–3).  Both the City Defendants and the County Defendants moved to dismiss the Second Amended Complaint.  (Dkts. 33, 34).  However, the County Defendants' motion was filed only on behalf of the County and the Sheriff's Office.  *See* Dkt. 34.  The County Defendants denied that Kelsey, Johnston, Bonner, or Brennan had been served.  *Id.* at 6.

On September 23, 2024, this case was referred back to the undersigned.  (Dkt. 37).  The court determined that the case was suitable for disposition without oral argument.  (Dkt. 45).  The court further ordered that Kelsey, Johnston, Bonner, and Brennan be served.  (Dkt. 48).  These

---

[6] Courts "may take judicial notice of judicial proceedings in other courts."  *Rosales-Martinez v. Palmer*, 753 F.3d 890, 894 (9th Cir. 2014).

United States District Court
Northern District of California

1    defendants were duly served (dkt. 53) and filed their own motions to dismiss (dkts. 54, 55).  All

2    parties have consented to the jurisdiction of a magistrate judge.  The court will now resolve the

3    motions filed by all defendants.

### III.    Legal Standard

5        Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the

6    claim showing that the pleader is entitled to relief."  Although a plaintiff need not include detailed

7    factual allegations in a complaint, the complaint must do more than recite elements of a cause of

8    action and state conclusions; rather, a plaintiff must state factual allegations sufficient to raise the

9    entitlement to relief "above the speculative level."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544,

10    555 (2007).  A complaint must proffer "enough facts to state a claim to relief that is plausible on

11    its face." *Id*. at 570.

### IV.    Claim 1 – Intentional Infliction of Emotional Distress

13        Plaintiff claims that the City Defendants intentionally inflicted emotional distress on him

14    by luring him away from his vehicle with a fake sighting of his cat, then seizing Plaintiff's vehicle

15    and the property inside.  Under California law, the elements of intentional infliction of emotional

16    distress (often abbreviated to "IIED") are "(1) outrageous conduct by the defendant, (2) intention

17    to cause or reckless disregard of the probability of causing emotional distress, (3) severe emotional

18    suffering and (4) actual and proximate causation of the emotional distress."  *Wong v. Jing*, 117

19    Cal.Rptr.3d 747, 766 (Cal. Ct. App. 2010).  The City Defendants argue that Plaintiff has failed to

20    properly allege the first and third elements.

21        First, the City Defendants claim that their conduct was not sufficiently outrageous.  "The

22    tort of IIED imposes liability for 'conduct exceeding all bounds usually tolerated by a decent

23    society, of a nature which is especially calculated to cause, and does cause, mental distress.'"

24    *Knight v. Wells Fargo Bank NA*, 459 F.Supp.3d 1288, 1293 (N.D. Cal. 2019) (quoting *Cole v. Fair*

25    *Oaks Fire Protection Dist.*, 43 Cal.3d 148, 155–56 n.7 (1987)).  Whether conduct meets this

26    threshold "is a question of fact for the jury to resolve unless reasonable minds could not differ on

27    the issue." *Jensen v. Thomas*, 2024 WL 2853981, at *4 (N.D. Cal. May 3, 2024) (quoting

28    *Duronslet v. County of Los Angeles*, 266 F.Supp.3d 1213, 1219 (C.D. Cal. 2017)).

United States District Court
Northern District of California

United States District Court
Northern District of California

1    The City Defendants argue that "[t]he use of a 'cat' ruse does not exceed all bounds of

2    civilized society but was reasonable to remove a volatile individual from a potentially volatile

3    situation." (Dkt. 33, p. 22).  However, this was not simply a "cat ruse."  Construing the

4    allegations in Plaintiff's favor, the City Defendants knew that Plaintiff's cat was his only

5    companion and that Plaintiff cared deeply for the cat.  The City Defendants also knew that local

6    juveniles were torturing and killing cats in the area, and they knew that *Plaintiff* knew this and was

7    concerned about it.  Using this knowledge, along with information Plaintiff gave the police when

8    reporting his cat's loss, the City Defendants transmitted false information over an official police

9    channel to convince Plaintiff that his beloved pet had fallen victim to sadists.  When Plaintiff went

10   to the cat's rescue, the City Defendants took the opportunity to seize Plaintiff's vehicle and all of

11   Plaintiff's belongings without warning.  Reasonable minds could find this ruse had no place in a

12   decent society.  California courts deem it "well settled" that the intentional killing or injury of a

13   pet can support an IIED claim.  *Berry v. Frazier*, 307 Cal.Rptr.3d 778, 793 (Cal. Ct. App. 2023).

14   Tricking a pet owner into believing that such an outrageous event has taken place in order to seize

15   all of the pet owner's earthly goods without warning could reasonably be deemed beyond all

16   bounds of decency.

17        While the City Defendants claim that their conduct was reasonable because Plaintiff is a

18   "volatile individual," this argument is best reserved for summary judgment.  Plaintiff claims that

19   the City Defendants have greatly exaggerated his volatility and dangerousness.  He admits to

20   headbutting one police officer several years earlier, but alleges that he was verbally and physically

21   provoked.   Plaintiff also argues that if the City Defendants really thought Plaintiff was volatile,

22   they would not have employed a ruse designed to play on his emotions in this way, an inference

23   the court finds reasonable at this juncture.  Finally, even if a "cat ruse" (a false sighting of

24   Plaintiff's cat or a report of an injured cat) was the only means to tow Plaintiff's car safely, an

25   inference the Court does not have to make at this stage, the reasonableness of indicating that

26   *Plaintiff's* cat had been tortured can certainly be questioned on these pleadings.

27        Second, the City Defendants argue that Plaintiff offers insufficient facts to support his

28

11

allegation of emotional harm, instead relying on "rank conclusions." (Dkt. 33, p. 22).[7]  However, Plaintiff claims that he "experienced and still do[es] experience sleeping problems, including nightmares & resulting sleep irregularities, as well as an inability to work due to the loss of energy & motivation associated with loss of enjoyment of life." (Dkt. 30, p. 11).  He specifically mentions "having nightmares & experiencing continuous emotional distress" in the interval between November 1 and November 7 "following the events of November 1[.]" *Id.* at 20.  Rather than being the "rank conclusions," these are allegations of specific harms.  California courts have found similar harms sufficiently severe to state an IIED claim.  *See, e.g., Saari v. Jongordon Corp.*, 7 Cal.Rptr.2d 82, 88 (Cal. Ct. App. 1992) (finding plaintiff's depression, nervousness, and "dragged out" feeling that left her "unable to do anything or go anywhere" met the emotional distress requirement).

Accordingly, Plaintiff's IIED claim may proceed.

## V.    Claim 2 – First Amendment

Plaintiff claims that his First Amendment rights were violated during his November 1 and November 7 arrests, during his incarceration, and by his conditions of release.  The court will discuss each claimed violation in turn.

### a.  November 1 Arrest

Plaintiff claims that Captain O'Neal violated Plaintiff's First Amendment rights on November 1 "by arresting me for expressing myself" with the "I'm about to kill you guys" statement.  (Doc. 30, p. 42).  However, Plaintiff concedes that he was convicted of violating California Penal Code § 148 for resisting this arrest.  *Id.* at 9.  "Under California law, a conviction under this statute requires that the defendant's obstructive acts occur while the officer is engaging in the *lawful* exercise of his duties." *Sanders v. City of Pittsburg*, 14 F.4th 968, 971 (9th Cir. 2021) (internal quotations omitted).  "Thus, the lawfulness of the officer's conduct is necessarily established as a result of a conviction under § 148(a)(1)." *Id.* (internal quotations omitted). Because Plaintiff was convicted under this statute, he cannot now challenge the lawfulness of the

---

[7] The page numbers in this order refer to the pagination generated by CM/ECF, not a document's internal numbering.

1    arrest he was resisting.  Otherwise, "a judgment in favor of the plaintiff would necessarily imply

2    the invalidity of his conviction[,]" which is impermissible under the Supreme Court's decision in

3    *Heck v. Humphrey*.  512 U.S. 477, 487 (1994).  Therefore, Plaintiff cannot state a First

4    Amendment claim as to his November 1 arrest.

5             *b.  November 7 Arrest*

6             Plaintiff also claims that his arrest on November 7 was in retaliation for his exercise of his

7    First Amendment rights.  Because the charges relating to this arrest were dismissed, *Heck* does not

8    bar this claim.

9             The City Defendants argue that because there was probable cause for Plaintiff's November

10   7 arrest, Plaintiff cannot claim it was retaliatory.  A plaintiff claiming retaliatory arrest must show

11   that there was no probable cause for the arrest.  *Nieves v. Bartlett*, 587 U.S. 391, 404 (2019).

12   Therefore, this court will consider whether Plaintiff's allegations plausibly demonstrate a lack of

13   probable cause.

14            The City Defendants claim that probable cause was established in the criminal proceedings

15   against Plaintiff, so Plaintiff cannot challenge that finding in this court.  They point to a document

16   reflecting a preliminary hearing at which Plaintiff was held to answer for a § 148 violation based

17   on the events of November 7.  (Dkt. 33-1, p. 25).  They also note, correctly, that "[t]he quantum of

18   evidence required to support a warrantless arrest is the same as the quantum of evidence required

19   to hold [a] defendant to stand trial" in California.  *Wige v. City of Los Angeles*, 713 F.3d 1183,

20   1185 (9th Cir. 2013) (quoted in Dkt. 33, p. 22).  Under *Wige*, "so long as the evidence known to

21   the arresting officers is not materially different from the evidence presented at the preliminary

22   hearing, a finding of sufficiency of the evidence to require the defendant to stand trial is a finding

23   of probable cause to arrest the defendant."  *Wige*, 713 F.3d at 1185–86.

24            In this case, however, Plaintiff alleges that *no* evidence about the events of November 7

25   was presented at the preliminary hearing, which certainly constitutes a material difference from

26   the facts known to the officers.  Further, the rule in *Wige* rests on the doctrine of issue preclusion,

27   which prevents the relitigation of issues already decided in separate proceedings.  *See Wige*, 713

28   F.3d at 1185.  In order for a California decision to preclude relitigation of an issue in federal court,

13

1    the issue must, among other things, "have been actually litigated . . . in the earlier action[.]" *Id.*

2    Because Plaintiff plausibly alleges that the events of November 7 were *not* actually litigated at the

3    preliminary hearing, *Wige* is inapposite at this stage.

4           Alternatively, the City Defendants argue that probable cause existed as a matter of law for

5    the November 7 arrest:

6            Less than a week after threatening to kill the officers, Plaintiff

7            interrupted a child neglect investigation and screamed at officers
             about his earlier arrest.  Plaintiff's behavior, conduct, demeanor, and

8            past experience with the involved officers were among the totality of
             the circumstances that provided probable cause . . . that he was

9            violating Penal Code section 148(a)(1).

10   (Doc. 33, p. 24).

11          Setting aside the City Defendants' lack of specificity as to their rationale, the Court is not

12   convinced that these factors establish probable cause as a matter of law at this juncture.  The Ninth

13   Circuit has said the following about when probable cause is established for purposes of Section

14   148:

15           Ninth Circuit law . . . clearly establishes the right verbally to challenge

16           the police," and "verbal protests [cannot] support an arrest under §
             148." *Mackinney v. Nielsen*, 69 F.3d 1002, 1007 (9th Cir.1995); *see*

17           *also Johnson*, 724 F.3d at 1174; *Duran v. City of Douglas*, 904 F.2d
             1372, 1378 (9th Cir.1990).  Likewise, "California law . . . gives

18           citizens considerable latitude in confronting the police." *Mackinney*,
             69 F.3d at 1007 (citing *People v. Wetzel*, 11 Cal.3d 104, 107–09, 113

19           Cal.Rptr. 32, 520 P.2d 416 (1974)).  Furthermore, Section 148 does
             not "criminalize[ ] a person's failure to respond with alacrity to police

20           orders." *People v. Quiroga*, 16 Cal.App.4th 961, 966, 20 Cal.Rptr.2d
             446 (1993); *see also Mackinney*, 69 F.3d at 1008 (holding that

21           plaintiff's "refus[al] to comply for a matter of seconds" with police
             officers' "order [ ] to stop writing on the sidewalk" was not a violation

22           of Section 148).

23   *Velazquez v. City of Long Beach,* 793 F.3d 1010, 1019 (9th Cir. 2015).  California courts have

24   noted that these principles apply even when "abusive language" is used against law enforcement,

25   emphasizing that "section 148 must be applied with great care to speech." *In re Mohammed C.*,

26   116 Cal.Rptr.2d 21, 25 (Cal. Ct. App. 2002).

27          To be sure, "protected speech is often a legitimate consideration when deciding whether to

28   make an arrest[.]" *Nieves*, 587 U.S. at 403.  It is certainly conceivable that the distraction posed

United States District Court
Northern District of California

14

by Plaintiff's shouting, combined with a threat the officers reasonably believed Plaintiff to pose, could have risen to the level of a Section 148 violation in the mind of a reasonable officer.  At this juncture, however, the court cannot say that Plaintiff's presence, conduct, and threat level were necessarily distracting enough to interfere with the City Defendants' duties.  *See Smith v. County of Orange*, 678 F.Supp.3d 1182 at 1192, 1200 (C.D. Cal. 2023) (denying summary judgment where "other than perhaps [one deputy] deciding to watch Plaintiff's actions, there [wa]s no evidence that Plaintiff precluded Deputies from carrying out their search" even though it was "undisputed that [the deputy] felt as though he 'had to stop searching'" to focus solely on the plaintiff for his partners' safety).  Accordingly, Plaintiff has plausibly alleged a lack of probable cause for his arrest.

For these reasons, the City Defendants' motion to dismiss will be denied as to Plaintiff's November 7 retaliatory arrest claims.

### c.  Failure to Accommodate Halal Diet

Plaintiff claims that the denial of a halal diet during his incarceration violated his First Amendment rights.  However, the Ninth Circuit has held that prisons may require inmates to fill out a formal application before receiving special religious diets.  *Resnick v. Adams*, 348 F.3d 763, 770–71 (9th Cir. 2003).  A later, unpublished Ninth Circuit decision held that requiring an inmate to reapply for a special diet is acceptable under *Resnick*.  *McKenzie v. Ellis*, 541 Fed. Appx. 784, 785 (9th Cir. 2013).  While the facts of this case differ because Plaintiff was housed in a jail that already had Plaintiff's dietary requirements on record, this court does not find this distinction to be a meaningful one, particularly because the plaintiff in *McKenzie* transferred institutions within the same prison system.  *McKenzie v. Ellis*, 2012 WL 4050297, at *2 (S.D. Cal. Sep. 13, 2012).  Further, much longer denials of religious diets due to bureaucratic requirements have been held constitutionally acceptable by other courts in this Circuit.  *Taylor v. Pelican Bay*, 2010 WL 2671989, at *8 (N.D. Cal July 2, 2010) (two-month delay in approving application for religious diet did not violate First Amendment); *Hays v. Gastelo*, 2021 WL 1749874, at *3 (C.D. Cal. May 4, 2021) (collecting cases of two-to-five-month delays held either constitutionally appropriate or entitled to qualified immunity).  For these reasons, Plaintiff has failed to state a claim regarding

United States District Court
Northern District of California

United States District Court
Northern District of California

1    the County Defendants' failure to provide him with a halal diet.

2             d.   Conditions of Release

3             Plaintiff alleges that the conditions of release imposed by Judge Brennan violated

4    Plaintiff's First Amendment rights by restricting his ability to observe and film law enforcement.

5    However, "[a] long line of [Supreme Court] precedents acknowledges that, generally, a judge is

6    immune from a suit for money damages." *Mireles v. Waco*, 502 U.S. 9, 9 (1991) (quoted in *Acres*

7    *Bonusing, Inc. v. Marston*, 17 F.4th 901, 915 (9th Cir. 2021)).  The only two exceptions to this

8    immunity are for actions not taken in the judge's judicial capacity and actions taken "in the

9    complete absence of all jurisdiction." *Id.* at 11–12 (quoted in *Acres*, 17 F.4th at 915).  Plaintiff has

10   only requested money damages in this suit.  (Dkt. 30, p. 53).  Therefore, unless Plaintiff can

11   adequately allege that Judge Brennan was either acting outside his judicial capacity or absent any

12   jurisdiction, the claims against Judge Brennan must be dismissed.

13            Plaintiff alleges that Judge Brennan was acting outside his judicial capacity because the

14   conditions imposed were unconstitutional.  However, "whether an act by a judge is a 'judicial' one

15   relate[s] to the nature of the act itself, *i.e.*, whether it is a function normally performed by a judge,

16   and to the expectations of the parties, *i.e.*, whether they dealt with the judge in his judicial

17   capacity." *Mireles*, 502 U.S. at 12 (quoted in *Acres*, 17 F.4th at 915).  The validity of the order is

18   not relevant to this exception.  Here, Judge Brennan imposed conditions of release while presiding

19   over Plaintiff's preliminary hearing.  This is a function normally performed by a judge and a

20   scenario in which Plaintiff dealt with the judge in his judicial capacity.  Accordingly, the judicial

21   capacity exception to judicial immunity does not apply.

22            Plaintiff further claims that Judge Brennan acted outside his jurisdiction in imposing the

23   conditions, again citing their alleged unconstitutionality.  However, "[t]o determine if the judge

24   acted with jurisdiction, courts focus on whether the judge was acting clearly beyond the scope of

25   *subject matter jurisdiction*" in the case. *Ashelman v. Pope*, 793 F.2d 1072, 1076 (9th Cir. 1982)

26   (en banc) (emphasis added).  Here, Brennan had subject matter jurisdiction to impose conditions

27   of release for Plaintiff.  "[E]ven if [Plaintiff] believes that certain acts . . . were contrary to law,

28   that does not mean the state court 'lacked all jurisdiction.'" *Arunachalam v. Davis*, 2022 WL

1    480679, at *1 (N.D. Cal. Feb. 15, 2022).

2         Accordingly, Plaintiff's First Amendment claim against Judge Brennan must fail.

3    **VI.    Claim 3 – Fourth Amendment**

4         Plaintiff asserts a number of claims under the Fourth Amendment.  The court will address

5    these in turn.

6         *a.   Towing of Vehicle*

7         Plaintiff does not dispute that his vehicle's registration was expired at the time it was

8    towed.  (Doc. 30, p. 5).  Further, Plaintiff does not argue that authorities lacked probable cause to

9    seize the vehicle.  Rather, Plaintiff argues that he was deprived of the warning customarily given

10   to owners of vehicles towed by the Fort Bragg Police Department, thus violating his Fourth

11   Amendment right against unreasonable seizures.

12        To the extent Plaintiff is arguing that he was unfairly treated differently than other vehicle

13   owners, his claim implicates the Fourteenth Amendment's Equal Protection Clause.  To the extent

14   that Plaintiff believes he was owed notice and an opportunity to move his vehicle onto private

15   property, his claim implicates the Fourteenth Amendment's Due Process clause.  Plaintiff's

16   Fourteenth Amendment claims are addressed in Section VII below.

17        To the extent Plaintiff is arguing that the deceptive *manner* of the seizure (the use of the

18   cat ruse to ensure his absence) violates the Fourth Amendment, he has stated a plausible claim.

19   "An otherwise lawful seizure can violate the Fourth Amendment if it is executed in an

20   unreasonable manner."  *United States v. Alvarez*, 491 F.3d 1013, 1016 (9th Cir. 2007).  In

21   determining reasonableness, courts "weigh the government's justification for its actions against

22   the intrusion into the [plaintiff's] interests."  *Id.*  When assessing the extent and nature of an

23   intrusion in Fourth Amendment cases, courts consider factors such as "the generating of concern

24   and fright[,]" whether the action "inflict[s] indignity and arouse[s] resentment[,]" and the failure to

25   provide "an opportunity to submit voluntarily to the officers' authority."  *Id.* (internal quotations

26   omitted).  Here, as alleged, the City Defendants' actions generated concern and fright wholly

27   unnecessary to the goal of seizing the vehicle.  Further, it would be natural for anybody to be

28   indignant and resentful as a result of this seizure strategy.  Finally, Plaintiff was not given an

United States District Court
Northern District of California

17

1    opportunity to comply voluntarily despite a custom of allowing such opportunities. Even

2    assuming that a ruse to separate Plaintiff from his vehicle was justified, the choice of this

3    particular ruse is questionable as pled. Therefore, the court concludes that Plaintiff has stated a

4    claim for a Fourth Amendment violation based on an unreasonable seizure.

5    　　　　　　*b. Giving Plaintiff's Keys to the Tow Company*

6    　　　　Plaintiff also claims that his Fourth Amendment rights were violated on November 1 when

7    his key ring (including both the keys to his seized vehicle and unrelated items) was taken from

8    him upon arrest and given to the tow company. The Court disagrees.

9    　　　　First, Plaintiff claims that his key ring was "not taken or withheld pursuant to any search

10    by law enforcement." (Dkt. 30, p. 8.) However, it appears from the complaint that Plaintiff's

11    keys were only taken after Plaintiff was arrested. *See id.* at 7–8. "[S]earch and seizure of an

12    individual's belongings incident to a lawful arrest is not unconstitutional." *Harrell v. Cal. State*

13    *Univ.*, 745 F.Supp.3d 922, 943 (N.D. Cal. 2024) (citing *Chimel v. California*, 395 U.S. 752, 760

14    (1969)). As Plaintiff is barred from asserting the unlawfulness of his November 1 arrest, it was

15    permissible for the City Defendants to seize Plaintiff's keys after his arrest.

16    　　　　Plaintiff further argues that the fact that his car keys were given to the tow company

17    instead of being retained by the City Defendants makes the seizure unreasonable. However, it is

18    permissible for an officer to give the keys of a towed vehicle to the towing company as a means of

19    securing the towing company's valid lien resulting from the tow. *Waters v. Howard Sommers*

20    *Towing, Inc.*, 2011 WL 2601835, at *7 (C.D. Cal. June 30, 2011). As Plaintiff does not challenge

21    the validity of the towing company's possessory lien on Plaintiff's vehicle under California

22    Vehicle Code § 22851, Plaintiff's challenge to the seizure of his car keys necessarily fails.

23    　　　　However, Plaintiff has stated a Fourth Amendment claim as to the *other* items on his key

24    ring. The flash drives and non-car keys on the ring were not required to secure the tow company's

25    possessory lien. The City Defendants have not set forth a legal basis for giving the items to the

26    tow company rather than removing them from the keychain and keeping them with other items

27    seized incident to Plaintiff's arrest. Construing the complaint in the light most favorable to

28    Plaintiff, it was unreasonable of the City Defendants to transfer the other keys and flash drives to a

private, third-party actor which did not need them, was not entitled to them, was no better equipped to care for them than the City Defendants were, did not have Plaintiff's permission to possess them, and does not appear to have been under any obligation to return them to Plaintiff upon Plaintiff's release. Accordingly, Plaintiff has alleged an unreasonable seizure of his other keys and flash drives under the Fourth Amendment.

   c.  *Arrests*

Plaintiff raises Fourth Amendment challenges to both the November 1 and November 7 arrests. The City Defendants argue that Plaintiff's claims are barred by the existence of probable cause for both arrests. As discussed above, Plaintiff may not challenge the lawfulness of the November 1 arrest; therefore, his Fourth Amendment claim must fail as to that arrest. However, Plaintiff has adequately pled a lack of probable cause for the November 7 arrest. As Defendants have raised no arguments against this claim besides the presence of probable cause, Plaintiff's Fourth Amendment claim may proceed as to the November 7 arrest.

   d.  *Miswak Destruction*

As this court has held in another case, the destruction of Plaintiff's miswak gives rise to a plausible claim under the Fourth Amendment:

> The Ninth Circuit has held that "the Fourth Amendment forbids . . . the destruction of a person's property, when that destruction is unnecessary—i.e., when less intrusive, or less destructive, alternatives exist." *San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose*, 402 F.3d 962, 977–78 (9th Cir. 2005). Here, the Court can think of at least one less destructive alternative to throwing Plaintiff's miswak on the ground—putting it in a plastic bag or other sanitary container and keeping it with his other property during his detention. Accordingly, Plaintiff has adequately stated a Fourth Amendment claim relating to the destruction of his miswak.

*Kisliuk v. City of Fort Bragg et al.*, Case No. 1:23-cv-06358-RMI, Dkt. 44, p. 9 (N.D. Cal. Oct. 30, 2024). So too here. Plaintiff's Fourth Amendment claim for the destruction of his miswak may proceed.

   e.  *Theft of Bracelet*

Plaintiff has failed to state a claim against the County for the theft of his silver bracelet. A local government "may not be held liable under § 1983 solely because it employs a tortfeasor."

1    *Bd. Of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 403 (1997).  Rather, courts "have

2    required a plaintiff seeking to impose liability on a municipality under § 1983 to identify a

3    municipal 'policy' or 'custom' that caused the plaintiff's injury." *Id.*  Plaintiff has not adequately

4    alleged that the theft of the bracelet resulted from a policy of the County.  *See* Sec. VIII *infra*.

5    Accordingly, while Plaintiff may have been able to state a Fourth Amendment claim regarding the

6    missing bracelet if he had named the deputy responsible as a defendant, he has not made a

7    sufficient showing to recover directly from the County for the theft.

8                      *f.  Over-Detention*

9            Plaintiff raises a Fourth Amendment challenge to his extended detention after he posted

10   bail following his November 7 arrest.  The crux of this particular argument, however, appears to

11   sound in due process (Plaintiff's detention on an alleged "verbal hold" without a hold ever having

12   been issued) rather than a lack of probable cause to believe that Plaintiff had committed the

13   charged offenses.  Accordingly, the refusal of bail should be analyzed under the Fourteenth

14   Amendment, not the Fourth.  *Cf. Garcia v. County of Riverside*, 2017 WL 3052981, at *4–*5

15   (C.D. Cal. July 17, 2017) (failure to take post-incarceration steps against wrongful detention

16   implicates the Fourteenth Amendment, not the Fourth).

17           Plaintiff also argues that he was detained without probable cause after both arrests.  For the

18   reasons stated *supra*, Plaintiff has adequately pled a lack of probable cause (and therefore stated a

19   claim under the Fourth Amendment) relating to the November 7 arrest, but not the November 1

20   arrest.

21                     *g.  Malicious Prosecution*

22           Plaintiff asserts that Prosecutor Kelsey violated Plaintiff's Fourth Amendment rights by

23   maliciously prosecuting him.  However, Kelsey's alleged conduct is entitled to absolute immunity.

24           "Prosecutors performing their official prosecutorial functions are entitled to absolute

25   immunity against constitutional torts" such as malicious prosecution.  *Lacey v. Maricopa Cty.*, 693

26   F.3d 896, 912 (9th Cir. 2012).  This immunity protects functions "intimately associated with the

27   judicial phase of the criminal process" in which the prosecutor acts as "an officer of the court."  *Id.*

28   (quoting *Van de Kamp v. Goldstein*, 555 U.S. 335, 342 (2009)).  These include "the lawyerly

20

functions of organizing and analyzing evidence and law, and then presenting evidence and analysis to the courts . . . on behalf of the government; they also include internal decisions and processes that determine how those functions will be carried out." *Lacey*, 693 F.3d at 913. This immunity applies "however inept or malicious" the prosecutor's actions are. *Id.*

Here, the actions in which Plaintiff alleges Prosecutor Kelsey engaged—reviewing evidence, bringing charges, and arguing for those charges before a court—fall comfortably within the ambit of a prosecutor's absolute immunity. Accordingly, Plaintiff's Fourth Amendment claim against Kelsey must fail.

## VII.    Claim 4 – Fourteenth Amendment

### a. *Due Process – Arrests*

Plaintiff alleges that his November 1 and November 7 arrests deprived him of due process contrary to the Fourteenth Amendment. However, Plaintiff argues that the process he was due was the pre-arrest establishment of reasonable suspicion or probable cause. (Dkt. 30, p. 49). Regarding the November 1 arrest, Plaintiff is precluded from asserting a lack of probable cause by his guilty plea. And while Plaintiff has adequately pled a lack of probable cause for the November 7 arrest, "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing such a claim." *Hall v. City of Los Angeles*, 697 F.3d 1059, 1068 (9th Cir. 2012) (quoting *Albright v. Oliver*, 510 U.S. 266, 273 (1994)). Because the Fourth Amendment requires a showing of probable cause before a person can be seized, it is the Fourth Amendment, not the Fourteenth, that governs Plaintiff's claim for arrest without probable cause.

### b. *Due Process – Detention*

#### i.    County Defendants

In the Ninth Circuit, "an accused has a Fourteenth Amendment due process right to have a state's bail system administered without caprice or discrimination[.]" *Kelly v. Springett*, 527 F.2d 1090, 1093 (9th Cir. 1975). Here, Plaintiff claims that he was denied bail based on a "verbal hold," allegedly a procedure with no grounding in state law, which in turn was allegedly based on

United States District Court
Northern District of California

1  a third party's report of a judge's order that never existed.  Construing these allegations in

2  Plaintiff's favor, the court finds that they could plausibly amount to capriciousness.

3  The County Defendants note that a police report attached to Plaintiff's operative complaint

4  "includes a statement that a FBPD officer contacted a judge during Plaintiff's booking, and the

5  judge ordered Plaintiff's bail revoked."  (Doc. 38, p. 12).  However, Plaintiff repeatedly asserts

6  that his bail was never actually ordered revoked.  (Doc. 30, pp. 25 (alleging there was "no formal

7  order from . . . the court revoking my bail" and "no real hold order"), 28 ("it was clear to the

8  Superior Court of Mendocino County that my bail was not revoked for the events of November 7

9  of 2023 as [Captain] O'Neal & [Sergeant] McLaughlin claimed it was"), 29 (alleging that O'Neal

10  and McLaughlin "communicated false claims to both the prosecutor & the jail that [the judge]

11  granted" their request to revoke Plaintiff's bail)).  To the extent that the police report, prepared by

12  one of the defendants who allegedly lied to others about the existence of the order, says otherwise,

13  that does not override Plaintiff's allegations.  Plaintiff's factual allegation that no actual revocation

14  took place is taken as true for purposes of his motion to dismiss.[8]

15  The County Defendants also argue that a revocation may be inferred from the fact that

16  Plaintiff agreed to additional conditions of bail before his ultimate release.  However, in the

17  absence of any cited law or rules of procedure indicating that this was necessarily the case, this

18  would be an impermissible inference in the County Defendants' favor on a motion to dismiss.

19  For these reasons, Plaintiff's Fourteenth Amendment claims for overdetention may

20  proceed against the County.

21  ii.  <u>Johnston and Bohner</u>

22

23  [8] The County Defendants, Johnston, Bohner, and Kelsey argue that Plaintiff's assertion that his
bail was not revoked is based only on the fact that Plaintiff believes that his bail could not have

24  been lawfully revoked verbally.  However, these defendants have presented no authority or
argument for the proposition that Plaintiff's bail *could* have been revoked verbally.  (Indeed,

25  Plaintiff alleges that the idea of a verbal revocation was alien to an experienced bail bondsman and
a lawyer.)  Further, California law dictates that a court must revoke bail "by an order entered upon

26  its minutes" which "must recite generally the facts upon which it is founded, and direct that the
defendant be arrested by any sheriff, marshal, or policeman in this state[.]"  Pen. § 1310–11.

27  Here, there is no indication that any order was entered on the court's minutes.  Indeed, it can be
reasonably inferred from Plaintiff's allegations that the court possessed no record of Plaintiff's

28  bail being revoked.

1    Lieutenant Johnston and Sergeant Bohner raise many of the same arguments as the County

2    Defendants, which fail for the same reasons discussed above.

3    Johnston and Bohner also claim they are entitled to absolute immunity because they acted

4    in compliance with Plaintiff's bail revocation, a facially valid judicial order.  The Ninth Circuit

5    recognizes that "prison officials charged with executing facially valid court orders enjoy absolute

6    immunity from § 1983 liability for conduct prescribed by those orders."  *Engebretson v. Mahoney*,

7    724 F.3d 1034, 1039 (9th Cir. 2013).  However, "[a]n official seeking absolute immunity bears the

8    burden of showing that it is justified."  *Slater v. Clarke*, 700 F.3d 1200, 1203 (9th Cir. 2012).

9    Here, Johnston and Bohner have failed to demonstrate that any court order at all was issued, let

10   alone a facially valid one.  Therefore, Johnston and Bohner have not met their burden to establish

11   absolute immunity on these grounds.  *Contrast Ayala v. San Bernardino Cty. Sheriff's Dept.*, 2014

12   WL 5089405, at *3 (C.D. Cal. 2014) (granting absolute immunity where the challenged

13   restraining orders "were signed by a judge, processed by a clerk, entered into a law enforcement

14   database, . . . appeared on their face to legitimately compel Plaintiff to remain more than 100 yards

15   away from the named protected person[,]" and were only set to expire the year after the challenged

16   arrest).

17   Lieutenant Johnston also argues that Plaintiff has not alleged Johnston's direct

18   involvement in a deprivation of rights, but only that Johnston was the supervisor on duty at the

19   time they were violated.  "A supervisory official is liable under § 1983 so long as there exists

20   either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient

21   causal connection between the supervisor's wrongful conduct and the constitutional violation."

22   *Rodriguez v. County of L.A.*, 891 F.3d 776, 798 (9th Cir. 2018) (internal quotations omitted).

23   Here, Plaintiff only alleges that Johnston "was supervising the jail" during Plaintiff's

24   overdetention.  (Dkt. 30, p. 26).  Because Plaintiff has not pled either Johnston's personal

25   involvement in the denial of bail or a causal connection between Johnston's conduct and the

26   alleged violation, Plaintiff's Fourteenth Amendment overdetention claims against Johnston must

27   be dismissed.  However, Plaintiff's overdention claims against Bohner may proceed.

28        *c.  Cat Ruse*

United States District Court
Northern District of California

Plaintiff alleges that the City Defendants' use of the fake report of an injured tabby violated Plaintiff's Fourteenth Amendment right to due process. The City Defendants argue that their conduct was not sufficiently conscience-shocking to violate Plaintiff's right to substantive due process. The court agrees that Plaintiff has not stated a claim for a substantive due process violation based on the cat ruse, but for a more fundamental reason: "To establish a substantive due process claim, a plaintiff must, as a threshold matter, show a government deprivation of life, liberty, or property." *Nunez v. City of Los Angeles*, 147 F.3d 867, 871 (9th Cir. 1998). The cat ruse, standing alone, did not deprive Plaintiff of any recognized liberty or property interest. And insofar as the cat ruse is considered as part of the seizure of Plaintiff's goods, it is properly analyzed as an unreasonable seizure under the Fourth Amendment, not a substantive due process violation under the Fourteenth. *See Fontana v. Haskin*, 262 F.3d 871, 881–82 (9th Cir. 2001). For this reason, Plaintiff cannot state a substantive due process claim relating to the cat ruse.

### VIII.   Supervisory Liability

The City Defendants argue that Plaintiff has not sufficiently stated a claim against Mayor Norvell and Chief Cervenka in their individual capacities. The Court agrees.

"A supervisor can be liable in his individual capacity for his own culpable action in the training, supervision, or control of his subordinates[.]" *Starr*, 652 F.3d at 1208. And a supervisor's "acquiescence in the unconstitutional conduct of his subordinates" is "sufficient to state a claim of supervisory liability" if there is "a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Id.* Such acquiescence can be demonstrated where a plaintiff "specifically alleges numerous incidents" of previous rights violations in "sufficient[] detail[] to give notice" of the claim against the supervisor and an opportunity to defend against it, and where the complaint's factual allegations "plausibly allege" acquiescence in these violations in a way that demonstrates deliberate indifference towards the plaintiff's rights. *Id.* at 1216. In short, a plaintiff needs to "allege specific facts to establish the defendant's 'knowledge of' and 'acquiescence in' the unconstitutional conduct of his subordinates." *Hydrick v. Hunter*, 669 F.3d 937, 942 (9th Cir. 2012) (quoting *Starr*, 652 F.3d at 1206–07).

United States District Court
Northern District of California

1      Here, Plaintiff names four specific incidents which he claims Mayor Norvell and Chief

2  Cervenka should have known about prior to November 1.  First, on August 6, 2022, two officers

3  (neither of whom is a defendant in this matter) pulled Plaintiff over for failing to make a complete

4  stop.  (Dkt. 30, p. 35).  Although Plaintiff took and passed a sobriety test, Plaintiff was arrested

5  and his car towed.  *Id.*  One officer told Plaintiff that Plaintiff had the right to either a breathalyzer

6  test or a blood test, but that the breathalyzer was broken.  Plaintiff was therefore taken to the

7  hospital for a blood draw before being "left in the street with no access to [his] car or clean

8  clothes." *Id.*

9      Second, on November 29, 2022, Plaintiff alleges that Captain O'Neal threatened him with

10  arrest after Plaintiff approached the driver of a car O'Neal was towing.  (Dkt. 30, p. 35).  O'Neal

11  originally ordered Plaintiff to move away from O'Neal, then demanded Plaintiff leave the scene

12  because Plaintiff had a pocketknife on his person.  *Id.*  As Plaintiff walked around the tow scene to

13  leave and was about to say something to O'Neal, O'Neal demanded that Plaintiff put his hands

14  behind his back, then handcuffed Plaintiff.  *Id.*  When Plaintiff demanded to know why he had

15  been arrested, O'Neal claimed that Plaintiff "ran up on [O'Neal] with [Plaintiff's] hand on

16  [Plaintiff's] knife[.]" *Id.* at 35–36.

17      Third, on January 5, 2023, Plaintiff stepped out of his hotel room to smoke.  (Dkt. 30, p.

18  36).  Captain O'Neal, who was passing by at the time, ordered Plaintiff to put his hands behind his

19  back, then handcuffed Plaintiff for 24 seconds.  *Id.*  Plaintiff complied.  After the 24 seconds had

20  passed, O'Neal realized that Plaintiff was not part of the Fort Bragg Police Department's hotel

21  voucher program and let Plaintiff go.  The officer accompanying O'Neal at the time, later

22  identified as Jeanette Ornelas, refused to provide her name when Plaintiff asked for it.  *Id.*

23      Fourth and finally, Plaintiff was arrested on April 13, 2023.  (Dkt. 30, p. 36).  Plaintiff

24  claims that officers lacked probable cause for both the arrest and a subsequent search of Plaintiff's

25  belongings.  *Id.*  Plaintiff also claims that officers defamed him to local hotels and instructed the

26  hotels not to rent to Plaintiff.  Plaintiff notes that these events are the subject of a separate lawsuit,

27

28

                                         25

1   #1:23-cv-06358-RMI.  *Id.*[9]

2       Plaintiff alleges that he submitted complaints to the Fort Bragg Police Department and tort

3   claims to the City of Fort Bragg regarding all of these incidents.  (Dkt. 30, pp. 37–38).  Plaintiff

4   states that video evidence proved the two 2022 claims, but that they were denied regardless.  *Id.* at

5   37.  Ultimately, Plaintiff's claims arising from all four incidents were denied by both the Police

6   Department and the City.  *Id.*  Chief Cervenka sent Plaintiff a letter stating that further complaints

7   by Plaintiff would be considered frivolous and not investigated.  *Id.*

8       Reviewing the pleadings and attached documents, the court concludes that Plaintiff has not

9   stated a claim for supervisory liability against Mayor Norvell.  Plaintiff simply has not alleged

10  sufficient facts to establish Norvell's actual knowledge of Plaintiff's claims.  By contrast, there are

11  indications that Chief Cervenka *may* have known about Plaintiff's pre-November 1 claims listed

12  above.  Cervenka specifically wrote to Plaintiff stating that Plaintiff's "volume of unfounded

13  complaints" were frivolous, perhaps indicating that Cervenka was familiar with some of Plaintiff's

14  pre-November 1 claims.  Cervenka also sent letters to Plaintiff regarding complaints Plaintiff

15  made about the events of November 1 and November 7, as well as an unspecified incident on

16  September 22.  In the letters, Cervenka claimed to have conducted "a thorough review of your

17  allegations, documents, and body worn camera[.]"  (Dkt. 31-1).  However, Plaintiff still has not

18  alleged any "specific facts" to establish Cervenka's personal knowledge of the *above-listed pre-*

19  *November 1* claims' contents, as is required under *Hydrick*.  Chief Cervenka's letters reference

20  only the November 1 and November 7 claims as well as a claim from September 22, 2023, which

21  is not detailed in Plaintiff's complaint.  Plaintiff has presented no "specific facts" indicating Chief

22  Cervenka's actual knowledge of the four earlier claims listed above.

23      For these reasons, Plaintiff has not stated a claim for supervisory liability against either

24  Norvell or Cervenka in their individual capacities.

25  ## IX.    *Monell* Liability

26      Plaintiff claims that both the City of Fort Bragg and Mendocino County have violated his

27

28  ---
    [9] It should be noted that in that lawsuit, the court ultimately found that the arrest, search, and contact with hotels did *not* violate Plaintiff's rights.  *Kisliuk v. City of Fort Bragg*, 2024 WL 4642868, at *5, *6 (N.D. Cal. Oct. 30, 2024).

United States District Court
Northern District of California

United States District Court
Northern District of California

1    rights under a theory of municipal liability.  The Court finds that Plaintiff has stated a claim

2    against the City but not the County.

3          A local government can be held liable under 42 U.S.C. § 1983 if its "policy or custom"

4    causes a plaintiff's rights to be violated.  *Monell v. Dep't of Soc. Servs. of City of New York*, 436

5    U.S. 658, 694 (1978).  Liability only attaches if the policy "inflicts the injury" of which the

6    plaintiff complains.  *Id.*; *see Dougherty v. City of Covina*, 654 F.3d 892, 900–01 (dismissing

7    complaint which lacked "any facts demonstrating that [the plaintiff's] constitutional deprivation

8    was the result of a custom or practice of the City . . . or that the custom or practice was the

9    'moving force' behind his constitutional deprivation.").

10          Plaintiff has plausibly alleged that his miswak was destroyed pursuant to a formal policy of

11    discarding the "biological" possessions of arrestees.  Accordingly, Plaintiff has stated a *Monell*

12    claim against the City as to its destruction.

13          Besides formal policies, *Monell* liability can arise from "practices of sufficient duration,

14    frequency and consistency that the conduct has become a traditional method of carrying out

15    policy[.]"  *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996).  Plaintiff alleges that the City "has a

16    longstanding, widespread & well-settled practice of violating the First, Fourth, and Fourteenth

17    Amendments & simultaneously intentionally inflicting emotional distress on individuals." (Dkt.

18    30, p. 35).  Plaintiff further alleges that City officials "sat idle & watched while their officers

19    committed multiple violations of First, Fourth, and Fourteenth Amendment rights [while] refusing

20    to properly discipline officers or take any accountability thereafter whatsoever."  *Id.*  Plaintiff also

21    accuses the City of failing to train its officers not to violate these amendments.  Similarly, Plaintiff

22    alleges that the County "has a widespread, well-settled policy of violating the First, Fourth, and

23    Fourteenth Amendments.  Policy makers at Mendocino County have failed to adequately train

24    their Sheriff's Office to protect the First, Fourth, and Fourteenth Amendments to the US

25    Constitution[.]"  *Id.* at 38.

26          To the extent that Plaintiff flatly asserts the existence of "widespread, well-settled policies"

27    of violating certain rights, this is a legal conclusion which this court may (and will) disregard.

28    *Dougherty*, 654 F.3d at 900–01.  Instead, the court will analyze the facts Plaintiff has alleged and

1    determine whether they demonstrate a "custom or practice" of a municipal defendant which was

2    "a moving force" behind the violations of Plaintiff's rights.  *Id.* at 901.

3        "A municipality's culpability for a deprivation of rights is at its most tenuous where a

4    claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011).  For liability to

5    attach, "a municipality's failure to train its employees in a relevant respect must amount to

6    deliberate indifference to the rights of persons with whom the untrained employees come into

7    contact." *Id.* (cleaned up).  "A pattern of similar constitutional violations by untrained employees

8    is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Id.*

9    at 62.  The similarity cannot only be a general legal one: the *Connick* Court found that a pattern of

10   *Brady* violations was insufficient to create failure-to-train liability in that case because none of

11   those previous *Brady* cases "involved failure to disclose blood evidence, a crime lab report, or

12   physical or scientific evidence of any kind[,]" making them dissimilar to the *Connick* plaintiff's

13   claims.  *Id.* at 62–63.

14       Under *Connick*, Plaintiff has failed to state a *Monell* failure-to-train claim against the

15   County.  Other than the failure to give Plaintiff a halal diet, which did not violate Plaintiff's rights,

16   Plaintiff has not alleged with any specificity that actions taken by the County against Plaintiff

17   were part of a pattern.

18       While Plaintiff has alleged four prior incidents of his rights allegedly being violated by

19   City officials, the court finds that these do not form a pattern sufficient to impose failure-to-train

20   liability under *Monell*.  To be sure, several of the alleged incidents implicate Plaintiff's First and

21   Fourth Amendment rights.  However, only one of the incidents—Plaintiff's detention after

22   approaching the towed vehicle to speak to Captain O'Neal and the vehicle owner—factually

23   resembles the November 7 arrest.  This single incident does not constitute a "pattern" of the kind

24   usually needed to demonstrate constructive notice to a municipality for failure-to-train purposes.

25   *Connick*, 563 U.S. at 62.  Further, the incident does not reflect "deliberate indifference to [a]

26   highly probable consequence" on which failure-to-train liability may be based without a pattern.

27   *Id.* at 63 (internal quotations omitted).  Accordingly, Plaintiff has not stated any *Monell* claims on

28   a failure-to-train theory.

United States District Court
Northern District of California

Turning to Plaintiff's other theories, which are only alleged against the City, "a failure to supervise that is sufficiently inadequate may amount to deliberate indifference" and thus give rise to *Monell* liability. *Dougherty*, 654 F.3d at 900. However, as with any *Monell* theory, Plaintiff must show "that the defendant was on actual or constructive notice that its omission would likely result in a constitutional violation." *Jackson v. Barnes*, 749 F.3d 755, 763 (9th Cir. 2014). In the Ninth Circuit, actual or constructive notice is generally established through a pattern of similar prior events. *See id.* at 764 (allegation that a defendant repeatedly failed to Mirandize detainees was "a critical factual allegation that render[ed]" the plaintiff's allegations of failure to supervise "specific" and "plausible"); *Fairley v. Luman*, 281 F.3d 913, 918 (9th Cir. 2002) (failure to create a policy to prevent the admittedly "not uncommon" occurrence of warrant mix-ups led to *Monell* liability). Here, by contrast, Plaintiff has not alleged any specific, recurring *type* of rights violation which might be prevented with better supervision, nor are any of his allegations the sort of "highly probable consequence" of deliberate indifference which can escape the general *Monell* pattern requirement. Accordingly, Plaintiff has not stated a *Monell* claim on a failure-to-supervise theory.

Plaintiff's failure-to-discipline *Monell* claims against the City, however, may proceed. Several courts in this District have concluded that "[i]f the same officer repeatedly violates the constitutional rights of a city's residents, and the city is on notice of these violations and fails to properly discipline the officer, by definition the city is deliberately indifferent to the likelihood that the officer will continue to commit constitutional violations in the future[.]" *Caldwell v. City of San Francisco*, 2020 WL 7643124, at *14 (N.D. Cal. Dec. 23, 2020) (quoting *Hayes v. Riley*, 2020 WL 5816581, at *2 (N.D. Cal. Sept. 30, 2020)). This aligns with *Larez v. City of Los Angeles*, in which the Ninth Circuit concluded that evidence of an ineffective system of discipline relating to citizen complaints was a "policy or custom [which] contributed to the police excesses complained of because the procedures made clear to officers that . . . they could get away with anything." 946 F.2d 630, 647 (9th Cir. 1991). Plaintiff has alleged that Captain O'Neal repeatedly violated his rights and that the City failed to discipline O'Neal despite the existence of evidence supporting Plaintiff's claims. At this preliminary stage, that is sufficient to state a

*Monell* claim against the City for failure to discipline O'Neal.

## X.    Manner of Dismissal

When dismissing a claim, a court "should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by other facts."  *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000).  This court concludes that the following claims made by Plaintiff cannot be cured by pleading additional facts and should therefore be dismissed with prejudice:

- Plaintiff's First and Fourth Amendment claims relating to his November 1 arrest.
- Plaintiff's Fourth Amendment claim relating to his prolonged detention after the November 7 arrest.
- Plaintiff's First Amendment claim concerning the County's refusal to provide Plaintiff with a halal diet when he was incarcerated following the November 1 and November 7 arrests.
- Plaintiff's Fourteenth Amendment claims based on a lack of probable cause for his arrests and the use of the cat ruse.
- Plaintiff's malicious prosecution claim against Prosecutor Kelsey.
- Plaintiff's First Amendment claims against Judge Brennan.

The following claims, which could possibly be cured by the allegation of additional facts, are dismissed without prejudice:

- Plaintiff's Fourth Amendment claim relating to the giving of Plaintiff's keys to the towing company.
- Plaintiff's Fourth Amendment claim relating to the theft of his bracelet.
- Plaintiff's Fourteenth Amendment overdetention claim against Lieutenant Johnston.
- Plaintiff's supervisory liability claims against Mayor Norvell and Chief Cervenka in their individual capacities.
- Plaintiff's *Monell* claims against the County.

## XI.    Conclusion

For the reasons stated above, Defendants' motions to dismiss are GRANTED IN PART

AND DENIED IN PART.  The claims specified in Section X are DISMISSED with or without prejudice as specified.  Defendants' motions are otherwise DENIED.

**IT IS SO ORDERED.**

Dated: April 10, 2025

_____
ROBERT M. ILLMAN
United States Magistrate Judge